**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 12 CR 591** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **MODIR TRADING,** | ) | |
| **ALI MOHAMMADI, and** | ) | |
| **EBRAHIM HALLAJI** | ) | |

**OPINION AND ORDER**

Defendants Modir Trading, Ali Mohammadi (Modir Trading's owner and sole

proprietor), and Ebrahim Hallaji (who is based in the United Arab Emirates and not yet arrested)

are charged with conspiring and attempting to export a Series 446 Rate Integrating Gyroscope,

Model LC08 to Iran without a license between February 2010 and April 2010.  Mohammadi

filed a motion to suppress evidence obtained on April 21, 2010, specifically, statements he made

to law enforcement officials on that day and the results of a search of his residence and

electronic devices.  Mohammadi contends that he was illegally seized and that his consent to

search and his waiver of his *Miranda* rights were involuntary.  The court held an evidentiary

hearing on Mohammadi's motion on June 27 and July 12, 2012.  For the following reasons,

Mohammadi's motion [#28] is denied

# BACKGROUND[1]

From February 2010 to April 2010, Mohammadi had been working to purchase a
gyroscope for Hallaji from an undercover federal agent. At Mohammadi's request, the
undercover agent met with him at Peet's Coffee ("Peet's") in Irvine, California on April 21, 2010
at 2 p.m. to deliver the gyroscope. An additional eight to ten federal agents dressed in
plainclothes were present on site. The investigating agents, Brian Sampson, a special agent with
the Bureau of Immigration and Customs Enforcement ("ICE"), and Jonathan Svendson, a special
agent with the Department of Commerce, both based in Illinois, planned to approach
Mohammadi after the meeting to obtain his cooperation in their investigation or, if that was not
forthcoming, seek instructions as to whether to arrest Mohammadi.

During Mohammadi's short meeting with the undercover agent, Mohammadi took the
gyroscope into his hands and inspected it. At some point during the conversation, the
undercover agent excused himself. This was the signal for Sampson and Svendson to approach
Mohammadi. After introducing themselves, they asked Mohammadi if he would be willing to
move to a more private location to talk. Mohammadi then left the inside of Peet's with the
agents and proceeded to part of Peet's outside seating area, where the conversation continued.
Mohammadi was informed of his *Miranda* rights and did not provide any indication that he did
not understand them. Sampson and Svendson then informed Mohammadi of the information
they had gathered during their investigation, presenting him with various emails and transcripts
of recorded conversations that they had gathered. Mohammadi was told of the seriousness of the

---

[1] The facts in the Background section come from the testimony of Agent Brian Sampson, Agent
Jonathan Svendson, and Mohammadi, in addition to the exhibits submitted to the court and Mohammadi's
two affidavits.

offense and was asked to cooperate with the investigation. The agents testified that they provided Mohammadi with a cooperation letter from the U.S. Attorney's Office for the Northern District of Illinois, although Mohammadi did not recall whether he received the cooperation agreement at that time. Mohammadi testified that he asked if he could leave this encounter and that the agents told him that if he did, he would be arrested. Sampson and Svendson denied telling Mohammadi that he was in trouble or would be arrested and stated that Mohammadi never asked them what would happen if he did not cooperate or if he wanted to leave. Sampson further testified that there was no reason to make any statements regarding what would happen if Mohammadi did not cooperate because he showed a willingness to do so.

After Mohammadi indicated he would cooperate, Sampson and Svendson requested that Mohammadi relocate with them to a more private location off-site. Mohammadi assented, according to Sampson and Svendson without hesitation. The agents testified that they explained to Mohammadi that they would go together and that Mohammadi was not in custody. Mohammadi does not recall being told that he was not in custody before leaving Peet's. Although Mohammadi was not patted down or placed in handcuffs, the agents did ask to look in the backpack he had with him before leaving. After reviewing the backpack's contents, the agents allowed Mohammadi to retain control of the backpack and everything inside, including his laptop computer and cell phone. Mohammadi then traveled in a vehicle with Sampson, Svendson, and an additional agent (who was driving) to the ICE office in Irvine.[2] Mohammadi's car remained in the Peet's parking lot. The vehicle carrying Mohammadi followed another car driven by a local federal agent. This was done, according to Sampson and Svendson, because

_____

[2] The vehicle used was a rental car and had no indications of a police car, such as a cage.

they were not familiar with Irvine and where the ICE office was located. Mohammadi testified that another car of federal agents followed the car in which he was traveling.

The ICE office was located approximately twenty minutes away from Peet's on the second floor of an office building in an office park. The agents parked in a secured parking lot and then proceeded with Mohammadi to the ICE office.[3] Mohammadi was taken to an approximately 9 foot by 13 foot interview room with two doors, a table, and four chairs,[4] where he remained with Sampson and Svendson.[5] Although Sampson testified that he believed one of the doors remained open throughout the interview, both Mohammadi and Svendson testified that both doors were closed. Sampson and Svendson testified that Mohammadi was again told he was not in custody, although Mohammadi testified he did not recall this. Sampson proceeded to read Mohammadi his *Miranda* rights again around 2:45 p.m. while Mohammadi followed along on a waiver form. Svendson testified that he crossed out the word "custody" on the waiver form because, as he explained again to Mohammadi, Mohammadi was not in custody. Mohammadi said little, if anything, and did not ask any questions. He initialed each statement of rights on a waiver form as it was read to him and then signed the bottom of the form indicating that he understood his rights and was waiving them. Despite this outward indication, Mohammadi testified that he did not understand what the right to remain silent meant, thinking that it meant to keep quiet and only answer questions that were posed to him.

---

[3] The parties disagree over the number of agents who entered the building with Mohammadi, with Sampson and Svendson testifying that there were four or five agents total, while Mohammadi testified that he was surrounded on all sides by all the agents present at Peet's that day.

[4] This room is used for interviews of individuals both in custody and not in custody.

[5] None of the other agents who had been at Peet's was present in the interview room, but agents were present in the ICE office during the time Mohammadi was there.

After reviewing the *Miranda* rights with Mohammadi, Sampson and Svendson resumed questioning Mohammadi, who continued to respond and provide the agents with information. Around 3:07 p.m., however, Mohammadi asked to speak to a lawyer. Mohammadi then used his own cell phone to place calls to two lawyers. Sampson and Svendson remained in the room while the calls were placed, and Sampson even spoke to the second lawyer Mohammadi contacted, explaining the possible charges before returning the phone to Mohammadi. After the second call ended, Sampson or Svendson reinitiated the conversation, asking what the lawyer said. The agents testified that Mohammadi indicated that the lawyer told him to continue cooperating, after which questioning continued. Mohammadi testified that he never said this and that instead the agents just continued asking him questions after he hung up the phone.

Around 4:30 p.m., Sampson and Svendson requested that Mohammadi consent to a search of his house and electronic devices. This consent was sought even though agents had already obtained a search warrant for the property. Sampson and Svendson reviewed two consent to search forms with Mohammadi, which he then signed. Although the forms stated that Mohammadi had been explained the terms of his consent and was providing his consent freely, voluntarily, and knowingly, Mohammadi testified that he did not actually know what he was consenting to. Nonetheless, after signing the forms, Mohammadi went with Svendson and several other agents to his house, where electronic equipment and other documents were retrieved from his room.

Upon Mohammadi's and Svendson's return to the ICE office, questioning resumed again in the same interview room. At some point thereafter, Mohammadi asked to use the restroom. He was accompanied there by Svendson, who testified that he went in part because he also

needed to use the restroom and because the restroom was located outside the ICE office's secured space and thus Mohammadi needed someone to let him back inside.

Around 7:35 p.m., Mohammadi agreed to make a recorded call on his cell phone to Hallaji. Mohammadi initially made a statement in English that the agents provided him with, and then he spoke to Hallaji in Farsi. After making the phone call, Mohammadi signed a form allowing Sampson and Svendson to assume control of two of his email addresses. The form indicated that this consent was given freely and voluntarily.

Before the interview concluded, Sampson and Svendson again presented Mohammadi with the cooperation agreement prepared by the United States Attorney's Office for the Northern District of Illinois. They reviewed the agreement with Mohammadi, who thereafter signed it. Mohammadi was also given a copy for his records. Mohammadi testified that he signed the cooperation agreement in part because he had no prior criminal experience and thought he had to do so or else he would go to jail. He also admitted, however, that he had been arrested several times and spent some time in jail. Once the cooperation agreement had been signed, the interview concluded around 8:40 p.m., and Mohammadi was driven back to the Peet's parking lot, where his car had been left. The agents told Mohammadi that they would be in touch.

Sampson and Svendson testified that throughout their encounter with Mohammadi on April 21, he appeared cognizant and aware of what was going on. Sampson did testify that Mohammadi initially appeared shocked when he was approached at Peet's but that his demeanor thereafter was casual and that Mohammadi did not appear reluctant to continue at any point. Sampson also commented that Mohammadi was never crying or visibly shaking. Svendson testified that Mohammadi was calm and cognizant and showed no indication of being afraid.

Mohammadi, on the other hand, testified that he was scared, intimidated, and felt as if he had no choice but to cooperate with the agents on that day. Mohammadi stated that, because he suffers from Attention Deficit Disorder ("ADD"), when he is under pressure, as he was on April 21, he draws blanks and that nothing works in his brain during that time. He admitted that Sampson and Svendson did not speak in a threatening way but nonetheless testified that he found them intimidating.

Mohammadi's cooperation with the government did not end that day. On April 23, 2010, two days after the interview, Mohammadi sent Sampson a text message, indicating that Hallaji had been contacting him and asking how he should respond. Sampson made arrangements with agents in the Irvine ICE office for Mohammadi to make an additional recorded call to Hallaji. Mohammadi then went to the ICE office and placed a call to Hallaji. Mohammadi and Sampson continued communicating by text message and phone until approximately the end of August 2010. Mohammadi was indicted in this case on July 31, 2012.

## ANALYSIS

## I.      Credibility Determination

Resolution of a motion to suppress is a fact-intensive inquiry in which the court must make credibility determinations based on its observation of the witnesses' demeanor and the testimony presented to it. *See United States* v. *Kempf*, 400 F.3d 501, 503 (7th Cir. 2005). As a threshold matter, the court must determine whether to credit the testimony of the agents or Mohammadi, who offered competing and at times conflicting versions of the events on April 21, 2010.

The court has carefully evaluated the demeanor and testimony of the witnesses. The agents testified credibly and for the most part consistently with each other and the documentary evidence.[6] Mohammadi, on the other hand, testified that, when under pressure, such as on April 21, 2010, his mind goes blank and he cannot concentrate on what is going on. At the same time, however, he testified in precise detail as to exactly what occurred on that day, couching much of his testimony in legal terms that would support a finding of custody or involuntariness.[7] Mohammadi cannot have it both ways, claiming to remember every detail for purposes of the custody inquiry while attempting to deny any understanding for purposes of the voluntariness inquiry. Further, his explanation that he was unfamiliar with the legal system and did not understand his rights, including the right to remain silent, is undercut by his prior encounters with law enforcement, which included spending time in jail, and the fact that he is well-educated, a college graduate who was confident enough in his abilities to start his own business. After carefully considering the testimony of the witnesses, assessing their credibility, and reviewing the submitted evidence, this court finds the agents' testimony to be more credible than that of Mohammadi.

---

[6] The agents were not, however, uniform in their answers, providing slightly inconsistent testimony on collateral matters.

[7] The declarations Mohammadi submitted include legal conclusions as well.

## II.    Statements Made on April 21, 2010

Mohammadi argues that all statements he made on April 21, 2010 should be suppressed because he was in custody and did not validly waive his *Miranda* rights or that, alternatively, all statements made after he invoked his right to counsel must be suppressed.  The government contends that Mohammadi was never in custody on April 21, and thus all statements he made that day are admissible.  The government concedes that if Mohammadi was in custody on April 21, statements he made after approximately 3:07 p.m., when he asked to call his attorney, are inadmissible.  The admissibility of Mohammadi's statements turns on whether Mohammadi was in custody.

Initially, although Mohammadi may have believed he was in custody on April 21 and did not feel free to leave, his "*subjective* views are not directly relevant to whether he . . . was in custody."  *United States* v. *Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012); *see also United States* v. *Snodgrass*, 635 F.3d 324, 328 (7th Cir. 2011) ("[A]lthough the defendant subjectively felt intimidated, we find that a reasonable person in [defendant's] position would have felt free to leave . . . .").  Instead, an objective standard applies, looking at whether "a reasonable person would feel free 'to disregard the police and go about his business.'"  *Florida* v. *Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting *California* v. *Hodari D*, 499 U.S. 621, 628, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)); *United States* v. *Scheets*, 188 F.3d 829, 836 (7th Cir. 1999).  Although custody is determined based on the totality of circumstances, courts have looked to the following factors: whether "(1) the encounter occurred in a public place; (2) the suspect consented to speak to the officers; (3) the officers informed the individual that he was not under arrest; (4) the individuals were moved to another area; (5) there was a

threatening presence of several officers and a display of weapons or physical force; (6) the officers deprived the suspect of documents needed to depart; and (7) the officers' tone of voice was such that their requests would likely be obeyed." *United States* v. *Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012) (quoting *United States* v. *Barker*, 467 F.3d 625, 629 (7th Cir. 2006)). Mohammadi's subjective view is not completely irrelevant, however; it "*may* be considered as circumstantial evidence of 'the atmosphere and how that would impact a reasonable person's perception' of the questioning." *Pelletier*, 700 F.3d at 1115 (quoting *Ambrose*, 668 F.3d at 959). *But see J.D.B.* v. *North Carolina*, --- U.S. ----, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011) (custody test "involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning").

Here, the initial encounter occurred at Peet's, a public place, and only later moved to the ICE office after Mohammadi agreed to go there with the agents. That Mohammadi was asked to move from the inside of Peet's to a location on the sidewalk in front of Peet's does not affect the custody determination; the space outside Peet's was not hidden from view nor was it enclosed and Mohammadi agreed to the change in location. *See United States* v. *Wyatt*, 179 F.3d 532, 536–37 (7th Cir. 1999) (defendant not in custody when questioned in a well-lit public place after being asked and escorted outside by officers who approached him in a bar); *Scheets*, 188 F.3d at 837 (defendant not in custody when asked to accompany agents to casino's security office where agents stressed that defendant was not under arrest and was free to leave at any time, no showing of force was made, and threatening behavior was not used). The agents did not make any show of force at any time, and Mohammadi even admitted that the agents did not speak to him in a threatening way. *Cf. United States* v. *Slaight*, 620 F.3d 816, 818 (7th Cir. 2010) (9 to 10 officers

broke into home and confronted defendant in his bedroom with guns drawn). Although Mohammadi denies being told that he was not in custody, as discussed above, the court finds the agents' testimony credible that this was indeed repeated several times, including when Mohammadi was reviewing the *Miranda* waiver form where the word "custody" is scratched out. And Mohammadi's receipt of *Miranda* warnings does not establish that he was in custody. *See Sprosty* v. *Buchler*, 79 F.3d 635, 642 (7th Cir. 1996) (mere administration of *Miranda* warnings does not establish custody, but "in the context of a prolonged detention where there is persistent, accusatory questioning by several officers, the fact that the police observed certain formalities of a custodial arrest without actually telling [defendant] that he was not under arrest does provide some support for an inference that [defendant] was in custody for purposes of *Miranda*").

Mohammadi contends that he was in custody because he was given a choice of cooperation or being arrested. That the agents presented him with evidence implicating him in a crime and indicated to him that it was a serious offense does not alone support a finding of custody. *See Stansbury* v. *California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). *But see Slaight*, 620 F.3d at 822 ("the more than likelihood that [defendant] would be formally placed under arrest if he tried to leave because the government already had so much evidence against him" weighed in favor of finding defendant was in custody). Although Mohammadi may have perceived a choice between being arrested or being let free, Sampson and Svendson credibly testified that they did not disclose any plan to

arrest Mohammadi if he did not cooperate. Thus, any undisclosed intentions to do so have no bearing on the custody question. *Stansbury*, 511 U.S. at 324.

Several factors are closer to the line but ultimately do not support a finding that Mohammadi was in custody. Although Mohammadi was taken to the ICE office in the agents' vehicle, he did not ask to drive himself and this was done, in part, for logistical reasons and does not on its own point toward custody. *Compare United States* v. *Fazio*, 914 F.2d 950, 956 (7th Cir. 1990) (defendant drove separately in own vehicle to municipal building to give statement to police, suggesting he was not in custody), *with United States* v. *Rainey*, 404 F. App'x 46, 56 (7th Cir. 2010) (defendant not in custody where brought to probation office in non-coercive way in government vehicle and was told that she was free to leave and would receive a ride home). The interview also was not necessarily rendered a custodial one by the fact that Svendson accompanied Mohammadi to the restroom where part of the reason for the escort was that Mohammadi needed to be let back into the secured ICE office, a security requirement applicable to all individuals visiting that office. *See United States* v. *Budd*, 549 F.3d 1140, 1145–46 (7th Cir. 2008) (security requirement that defendant be escorted to bathroom was not enough to transform non-custodial interview into a custodial one, as security provisions applied to all non-staff); *see also Ambrose*, 668 F.3d at 956–57 ("FBI building requirements that mandated escorts for visitors is not in itself a basis for a reasonable person to believe that he is not free to leave."). And although the interview room is not as large as the conference room used in *Ambrose*, it also is not the "Lilliputian" room that the Seventh Circuit found to be one factor that counseled in favor of finding custody in *Slaight*. *Compare Slaight*, 620 F.3d at 819–22 (room used was estimated to be either 5 x 7 or 8 x 8, was windowless, and contained a desk and three chairs),

*with Ambrose*, 668 F.3d at 957 (large conference room used could seat over 20 people and had two doors that remained fully or partly open throughout the interview). The existence of other more extreme circumstances in *Slaight*, however, counsels against following that court's decision that the defendant there was in custody. *See Slaight*, 620 F.3d at 819–22 (officers broke into the defendant's house with weapons drawn to execute a search warrant, the defendant was left locked in the interview room for forty minutes, and officers denied the defendant's request to leave the room to smoke a cigarette).

Instead, this case is analogous to *United States* v. *Jones*, 21 F.3d 165 (7th Cir. 1994), where the Seventh Circuit affirmed the district court's finding that Jones had not been subjected to a custodial interrogation. In *Jones*, the defendant attempted to buy drugs from an undercover agent in a motel room. *Id.* at 167. A uniformed police officer then entered the motel room with a gun drawn, and a sergeant told Jones that he wanted to speak with him. *Id.* About five to seven other officers were present. *Id.* Two agents took Jones with them in a squad car to police headquarters, while other agents drove Jones's van to police headquarters. *Id.* Jones was then taken into a large room with approximately three to four desks, where he was questioned by two to three agents. *Id.* The door was closed but unlocked, and Jones was told at various points that he was not under arrest and not in custody. *Id.* Here, no gun was drawn, but the interview room was smaller than that in *Jones*. These differences effectively balance each other out in the calculus. Having considered the totality of the circumstances, the court finds that Mohammadi

was not in custody at any point on April 21, 2010.[8]  Mohammadi's statements on April 21 will not be suppressed.

## II.    Search of Mohammadi's Home

In addition to contesting the admission of the statements he made on April 21, 2010, Mohammadi also argues that his consent to the search of his home and electronic equipment was invalid and thus the results of that search should be suppressed.

The Fourth Amendment prohibits warrantless searches of a home absent the voluntary consent of an individual possessing authority to so consent.  *Georgia* v. *Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006).  The government has the burden of demonstrating that consent was voluntary, "a question of fact to be determined from all the circumstances."  *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  Factors considered include Mohammadi's age, education, and intelligence, the length of detention prior to obtaining consent, whether the police repeatedly asked for consent, whether physical coercion was used, and whether Mohammadi was in custody.  *United States* v. *Strache*, 202 F.3d 980, 985 (7th Cir. 2000).

Mohammadi signed not just one but three different forms authorizing the searches, affirming in each that he understood his right to refuse consent and that his consent was given freely and voluntarily.  Initially, these signed statements are evidence of the voluntariness of Mohammadi's consent.  *See United States* v. *Navarro*, 90 F.3d 1245, 1257 (7th Cir. 1996).

---

[8] Because the court concludes that Mohammadi was not in custody at any point on April 21, 2010, the court need not address whether Mohammadi's waiver of his *Miranda* rights was valid.  *See J.D.B.*, 131 S. Ct. at 2402 ("Because these measures protect the individual against the coercive nature of custodial interrogation, they are required only where there has been such a restriction on a person's freedom as to render him in custody." (internal quotation marks omitted)).

Despite his signature on these forms, Mohammadi argues that his consent to the searches was not voluntary.[9] Moreover, Mohammadi was an adult at the time, had a bachelor's degree from the University of California, Santa Barbara, and owned his own business. *See United States* v. *LaGrone*, 43 F.3d 332, 334 (7th Cir. 1994) (finding that consent was voluntary where, among other things, defendant had high school diploma and "the intelligence necessary to own and manage his own business"). The court has already found that Mohammadi was not in custody at the time, and there is no evidence that physical coercion was used. There is also no indication that the agents had to repeatedly ask Mohammadi for consent before it was given.

Mohammadi contends, however, that he was under pressure and could not understand what he was consenting to because his mind draws a blank in such pressure situations. But neither his own testimony, in which he provided great detail regarding the events of April 21, nor the fact that he suffers from ADD supports the conclusion that he did not understand that he was consenting to a search of his home or that his consent was not voluntary. Being diagnosed with or treated for ADD alone is not dispositive of voluntariness. *Rangel* v. *Reynolds*, 607 F. Supp. 2d 911, 928–29 (N.D. Ind. 2009) (ADHD alone was not sufficient to render consent to search by 22-year old involuntary, collecting cases where presence of more severe mental impairments was found not to render consent invalid); *see also Mecham* v. *Smith*, No. 1:10-CV-00264-CV-EJL, 2011 WL 3626307, at *9 (D. Idaho Aug. 17, 2011) (mental health issues (including possible ADHD diagnosis) are non-dispositive factors to be considered in determining if waiver was voluntary); *Smith* v. *Bobby*, No. 3:09CV470, 2010 WL 749938, at *4 (N.D. Ohio Feb. 22, 2010)

---

[9] Mohammadi additionally argues that any consent he provided was tainted by an illegal seizure. But because the court has found that Mohammadi was not in custody on April 21 and thus not seized, this argument fails.

(waiver of *Miranda* rights not affected by defendant's bipolar condition or ADHD or deprivation of medication for those conditions for 8 days prior to first interrogation where video showed defendant to be coherent and defendant did not present any evidence of effects of lack of medication); *cf. Fewless ex rel. Fewless* v. *Bd. of Educ. of Wayland Union Sch.*, 208 F. Supp. 2d 806, 814–15 (W.D. Mich. 2002) (consent of fourteen year-old special needs student with ADHD found not to be voluntary where scope of search not fully explained and no clear consent given). Mohammadi's medical records suggest trouble focusing while in college and more recently at work, but he nonetheless managed to graduate from the University of California, Santa Barbara and open his own business. Although untreated on April 21, 2010, there is no indication that his ADD was so significant that "he was unable to freely and intelligently converse with" the agents. *See Sandifer* v. *Roberts*, No. 04-3412-WEB, 2006 WL 3256498, at *6–7 (D. Kan. Nov. 9, 2006) (mental ability of defendant with ADHD "was not so impaired that he was unable to freely and intelligently converse with police" where he was in his thirties, had a GED, and was a head maintenance man at an apartment complex). Instead, the agents testified that Mohammadi gave no indication of any impairment, appeared to understand what was going on and in fact so indicated, and was responsive and cooperative throughout. Mohammadi's ADD, then does not call into question the voluntariness of his consent.

Mohammadi also argues that his waiver was coerced because he was given the choice to either cooperate or be arrested. The court has already found that this choice was not explicitly presented to Mohammadi, although Mohammadi could have interpreted the circumstances as such. But even if true, being presented with this choice does not constitute coercion. *See United States* v. *Miller*, 450 F.3d 270, 272 (7th Cir. 2006) ("A choice between cooperation and freedom,

16

on the one hand, and silence followed by custody and prosecution, on the other, is a common one.  This is the real choice many suspects face whether or not the police lay it out in so many words; clear articulation of the options makes a choice better informed and thus more rather than less voluntary."), *abrogated on other grounds by Kimbrough* v. *United States*, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007); *see also United States* v. *Alexander*, 573 F.3d 465, 478 (7th Cir. 2009) ("[A]n officer's factually accurate statement that the police will take lawful investigative action in the absence of cooperation is not coercive conduct.").[10]  Having rejected Mohammadi's arguments and considered the totality of the circumstances, the court finds that the government has met its burden of establishing that Mohammadi's consent to search was voluntary.[11]

---

[10] Mohammadi also argues that his consent was involuntary because it was procured after he was in custody.  Even if the court had concluded that he was in custody at the time he provided consent to the search, this alone does not make the consent coerced.  *United States* v. *Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.").  Mohammadi also argues that his consent was involuntary because he signed the consent form after he invoked his right to counsel.  But this argument is foreclosed by the Seventh Circuit's holding that "a consent to search is not an interrogation within the meaning of *Miranda*."  *United States* v. *Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) ("[T]he consent to search was not a custodial interrogation triggering the previously invoked *Miranda* right to counsel."); *see also United States* v. *Bustamante*, 493 F.3d 879, 892 (7th Cir. 2007) (collecting cases); *LaGrone*, 43 F.3d at 335 ("[B]ecause requesting consent to search is not likely to elicit an incriminating statement, such questioning is not interrogation, and thus *Miranda* warnings are not required.").

[11] Because the court finds that Mohammadi's consent to search was voluntary, the court need not address the government's argument that the inevitable discovery doctrine also applies to the results of that search to make them admissible.

**CONCLUSION**

For the foregoing reasons, Mohammadi's motion to suppress [#28] is denied.  This case is set for a status hearing on July 31, 2013 at 9:15 a.m.


Dated: July 18, 2013                                        ENTER:


                                                           _____
                                                           JOAN HUMPHREY LEFKOW
                                                           United States District Judge